# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TRISH HIESTER, | : | 3:12cv1350 |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| CAROLYN W. COLVIN,[1] | : | |
| Commissioner of Social Security | : | |
| **Defendant** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Before the court for disposition is Plaintiff Trish Hiester's (hereinafter

"Hiester") appeal of the Defendant Commissioner of Social Security's

(hereinafter "Commissioner") denial of her application for disability insurance

and supplemental security income benefits.[2] (Doc. 1).

---

[1]   When plaintiff filed this action, Michael J. Astrue was the Commissioner of Social Security. Accordingly, plaintiff named him as the defendant in his official capacity. Since then, however, Astrue left his position as Commissioner. Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. See OFFICIAL SOCIAL SECURITY WEBSITE, http://www.socialsecurity.gov/pressoffice/factsheets/colvin.htm (last accessed Dec. 12, 2013). Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Michael J. Astrue as the defendant in this suit. FED. R. CIV. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party.")

[2]   Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. 42 U.S.C. §§ 415(a) and 416(i)(1). The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." See 42 U.S.C. § 416(i)(2). Here, the record

**Background**

On July 13, 2009, Hiester filed applications for disability insurance and supplemental security income (hereinafter "SSI") benefits due to several mental impairments. (Doc. 7, Admin. R. (hereinafter "R.") at 5, 67-68).[3] In both applications, Hiester alleges her disability began on June 1, 2009. (Id.) On November 9, 2009, the Bureau of Disability Determination denied Hiester's applications.[4] (Id. 69-77). Hiester then filed a request for a hearing before an Administrative Law Judge (hereinafter "ALJ").

The ALJ held a hearing on October 6, 2010. (Id. at 25-65). At the hearing, the ALJ noted that Hiester was thirty-three (33) years old on the alleged disability onset date and thirty-five (35) years old on the date of the administrative hearing. (Id. at 20). Hiester is high school educated and can

_____

establishes that Hiester met the Social Security Act's insured status requirement. (R. at 15).

      Supplemental security income (hereinafter "SSI") is a federal income supplement program funded by general tax revenues (not social security taxes). 42 U.S.C. § 1381. It is designed to help the aged, blind or disabled individuals who have little or no income. 42 U.S.C. § 1381a. Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits. 42 U.S.C. § 1382.

   [3] References to "R. at __" are to pages of the administrative record filed by the Defendant as part of his Answer on September 13, 2012.

   [4] The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance and SSI benefits on behalf of the Social Security Administration. (R. at 205-06).

read, write, speak and understand the English language.  (Id.)  Hiester claims that she suffers from Bipolar I Disorder, Attention Deficit Hyperactivity Disorder, Anxiety and Depression and that these impairments preclude her from working well with others and make it difficult for her to understand concepts, follow directions and complete tasks.  (Id. at 16).

Hiester testified that she lives with her three children, ages 6, 9, and 17, in addition to an 18 year old for whom she is the legal guardian.  (Id. at 31). She is able to care for the four children without assistance.  (Id. at 16, 176). Hiester does not have any difficulty with personal care activities such as dressing, bathing, caring for her hair, or feeding herself.  (Id. at 16).  Hiester can prepare meals for her family, clean her house, wash her clothing and leaves her house on a daily basis.  (Id.)  Hiester has difficulty with sleeping due to stress.  (Id.)   Hiester also stated that she frequents Wal-Mart and goes out in public every day without assistance.  (Id.)  Hiester has a driver's license and she is able to drive.  (Id. at 34).

The vocational expert stated that Hiester has past relevant work as a waitress and cashier at Dunkin Donuts.[5]  (Id. at 32-34).  These positions are

---

[5]  "Past relevant work" means work Hiester performed during the fifteen years prior to the date her claim for disability was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560(b)(1) and 404.1565.

described as light work.[6]  (R. at 55).  At the time of the hearing, Hiester continued working as a cashier at Dunkin Donuts, seven hours a day during the store's busiest hours, four to five days per week.  (Id. at 31).  Hiester has never been written up by employers for work-related problems.  (Id. at 34).

On November 16, 2010, the ALJ issued a decision denying Hiester's applications for disability insurance and SSI benefits finding that Hiester could perform a range of unskilled work.[7]  (Id. at 17-21).  Hiester timely requested

---

[6]  Light work is defined in the regulations of the Social Security Administration as follows:

> (b) Light work.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567 and 416.967.

[7]  The term "Unskilled work" is defined in the regulations of the Social Security Administration as follows:

> (a) Unskilled work.  Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.  The job may or may not require considerable strength.  For example, we consider jobs

4

the Appeals Council review the ALJ's decision.  (Id. at 7).  On June 14, 2012, the Appeals Council denied Hiester's request for review.  (Id. at 1).  Thus, the ALJ's decision stood as the Commissioner's final decision.[8]  As a result of the Commissioner's denial of disability insurance and SSI benefits, Hiester filed an appeal in this court on July 12, 2012.[9]  The parties then briefed the issues bringing the appeal to its present posture.

**Jurisdiction**

The court has federal question jurisdiction over this Social Security Administration appeal.  See 42 U.S.C. § 1383(c)(3) ("The final determination of the Commissioner of Social Security after a hearing under paragraph (1)

---

unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed.  A person does not gain work skills by doing unskilled jobs.

20 C.F.R. § 404.1568(a).

[8]  The Appeals Council may deny a party's request for review or it may decide to review a case and make a decision. The Appeals Council's decision, or the decision of the administrative law judge if the request for review is denied, is binding unless a claimant files an action in federal district court within 60 days after receiving notice of the Appeals Council's action.  20 C.F.R. § 404.981.

[9]  Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  L.R. 83.40.1.

shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title."); see also  42 U.S.C. § 405(g) ("Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow.  Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business . . . .").

## STANDARD OF REVIEW

In reviewing a social security appeal, the court must determine whether "substantial evidence" supports the ALJ's decision.  See 42 U.S.C. § 405(g); Hagans v. Comm'r of Soc. Sec., 694 F.3d 287, 292 (3d Cir. 2012); Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).  The United States Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).  The Third Circuit Court of Appeals has explained that "substantial evidence has been defined as 'more than a mere scintilla;' it means 'such relevant evidence as a reasonable mind

6

might accept as adequate.'"  Hagans, 694 F.3d at 292 (quoting Plummer, 186 F.3d at 427).

The court should not reverse the Commissioner's findings merely because evidence may exist to support the opposite conclusion.  See 42 U.S.C. § 405(g); Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir.  2005) (stating that courts may not weigh the evidence or substitute its own conclusion for those of the fact-finder); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) (indicating that when an ALJ's findings of fact are supported by substantial evidence, courts are bound by those findings, even if they would have decided the factual inquiry differently).  In an adequately developed factual record, substantial evidence  may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo, 383 U.S. at 620.

Substantial evidence exists only "in relationship to all the other evidence in the record," and "must take into account whatever in the record fairly detracts from its weight."  Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971); Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981).  "When a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason."  Plummer, 186 F.3d at

7

429 (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)). The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 204 (3d Cir. 2008). Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

Another critical requirement is that the Commissioner adequately develop the record. Poulous v. Comm'r of Soc. Sec., 474 F.3d 88, 95 (3d Cir. 2007) (reminding ALJs of their duty to develop the record); Ventura v. Shalala, 55 F.3d 900, 902 (3d Cir. 1995) (stating that ALJs have an affirmative duty to develop a full and fair record in social security cases). If the record is not adequately developed, remand for further proceedings is appropriate. Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505 (3d Cir. 2009).

## Sequential Evaluation Process

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any **substantial gainful activity** by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (emphasis added). An individual is incapable of engaging in "substantial

8

gainful activity" when "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

The Commissioner evaluates disability insurance and supplemental security income claims with a five-step sequential analysis.  20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4).  This analysis requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[10] (2) has an impairment, or combination of impairments, that is severe,[11] (3) has an impairment or combination of impairments that meets or

---

[10] "Substantial gainful activity" is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit."  20 C.F.R. §§  404.1510 and 416.910.  If the claimant is engaging in "substantial gainful activity", the claimant is not disabled and the sequential evaluation proceeds no further.

[11] A "severe impairment" significantly limits a claimant's physical or mental ability to perform basic work activities.  20 C.F.R. § 404.1520(c).  Basic physical work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl and handle.  20 C.F.R. § 404.1545(b).  An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures.  20 C.F.R. § 1545(c).
The determination of whether a claimant has any severe impairments that has lasted or is expected to last for a continuous period of at least twelve (12) months, at step two of the sequential evaluation process, is a threshold test.  20 C.F.R. §§ 404.1509, 404.1520(c) and 416.920(c).  If a claimant does

equals the requirements of a "listed impairment,"[12] (4) has the "residual

functional capacity" to return to his or her past work and (5) if not, whether he

or she can perform other work in the national economy. 20 C.F.R. §§

404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v). Prior to addressing step four,

the ALJ must determine the claimant's residual functional capacity.[13] 20

C.F.R. §§ 404.1520(a)(4)(iv) and 416.920(a)(4)(iv).

Residual functional capacity is the individual's maximum remaining

ability to do sustained work activities in an ordinary work setting on a regular

_____

not have any severe impairment or combination of impairments which
significantly limits his physical or mental abilities to perform basic work
activities that has lasted or is expected to last for a continuous period of at
least twelve (12) months, the claimant is "not disabled" and the evaluation
process ends at step two. Id.

    If a claimant has any severe impairments, the evaluation process
continues. 20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all
medically determinable impairments, severe and non-severe, are considered
in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§
404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2).

    [12] A "listed impairment" is one that appears on the Commissioner's
Listing of Impairments, which is "a list of impairments presumed severe
enough to preclude any gainful work." Sullivan v. Zebley, 493 U.S. 521, 525
(1990); see 20 C.F.R. pt. 404, subpt. P, app. 1 (listing of impairments). If the
claimant has an impairment, or combination of impairments, that meets or
equals a listed impairment, the claimant is disabled. If the claimant does not
have an impairment or combination of impairments that meets or equals a
listed impairment, the sequential evaluation process proceeds to the next
step.

    [13] If the claimant has the residual functional capacity to do his or her
past relevant work, the claimant is not disabled.

10

and continuing basis.  <u>See</u> SSR 96-8p, 1996 WL 374184.[14]  A regular and

continuing basis contemplates full-time employment and is defined as eight

hours a day, five days per week or other similar schedule.  <u>Id.</u>  The residual

functional capacity assessment must include a discussion of the individual's

abilities.  <u>Id.</u>; 20 C.F.R. §§ 404.1545 and 416.945;  <u>Fargnoli</u>, 247 F.3d at 40

(defining residual functional capacity as that which an individual is still able to

do despite the limitations caused by his or her impairment(s)).

**Discussion**

Based upon the medical records and testimony, the ALJ at step one of

the sequential evaluation found that Hiester has not engaged in substantial

gainful activity since June 1, 2009.  (R. at 15).  The ALJ determined at step

two that Hiester had the following severe impairments:  Attention Deficit

Hyperactivity Disorder, Bipolar I Disorder, Anxiety, and Depression.  (<u>Id</u>. at

16).  At step three, the ALJ found that Hiester's impairments moderately

limited her ability to perform some basic work-related activities but did not rise

---

[14]  Social Security Rulings (hereinafter "SSR") constitute the Social
Security Administration's interpretations of the statute it administers and of its
own regulations.  <u>Molina v. Astrue</u>, 674 F.3d 1104, 1113 n.5 (9th Cir. 2012);
<u>Lauer v. Apfel</u>, 169 F.3d 489, 492 (7th Cir. 1999).  SSRs do not have the force
of law, <u>id.</u>; nevertheless, once published, they are binding on all components
of the Social Security Administration.  <u>Heckler v. Edwards</u>, 465 U.S. 870, 873
n.3 (1984); <u>Boone v. Barnhart</u>, 353 F.3d 203, 210 n.16 (3d Cir. 2003); 20
C.F.R. § 402.35(b)(1).

to the listing level of severity.[15] (Id.)

Prior to addressing step four, the ALJ determined that Hiester retained the residual functional capacity to perform a full range of work at all exertional levels but is compromised by certain nonexertional limitations. (Id. at 17). In setting the residual functional capacity, the ALJ stated that the objective medical evidence did not support Hiester's statements concerning the intensity, persistence, or limiting effects of her impairments. (Id. at 18). The ALJ also found that Hiester's statements were not credible because they were overstated, inconsistent with and unsupported by the great weight of the

---

[15] In making this finding, the ALJ determined that Hiester failed to satisfy paragraph B criteria. (R. at 16-17) see also 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04(B) (stating that a claimant must establish at least "two of the following: (1) marked restriction of daily living; or (2) marked difficulties in maintaining social functioning; or (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.").

The Social Security regulations rate the degree of functional limitation regarding activities of daily living, social functioning and concentration, persistence or pace utilizing the following five-point scale: None, mild, moderate, marked and extreme. 20 C.F.R. §§ 404.1520a(c)(4) and 416.920a(c)(4). The fourth functional area, episodes of decompensation, is ranked on a four-point scale: None, one or two, three, four or more. Id. The last point on both functional limitation rating scales represents "a degree of limitation that is incompatible with the ability to do any gainful activity." Id.

A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with a claimant's ability to function independently, appropriately, effectively, and on a sustained basis. See §§ 404.1520a(c)(4) and 416.920a(c)(4).

documentary evidence.  (Id. at 17-21).

At step four, the ALJ determined that Hiester was unable to perform her past relevant work as actually or generally performed.[16]  (Id. at 20).   The ALJ found, however, that Hiester was capable of making a vocational adjustment to a significant number of jobs in the national economy but has nonexertional limitations that necessitate being limited to unskilled work with language levels of two or less.[17]  (Id. at 17).  Finally, based on Hiester's age, education, work experience, and residual functional capacity, the ALJ at step five stated that Hiester had the ability to perform the following unskilled work: a kitchen helper at the medium exertion level, an industrial cleaner at the medium exertional level, and a retail marker at the light exertional level.  (Id. at 18).  The ALJ also stated that there existed a significant number of such jobs in the national economy.  (Id.)  Thus, the ALJ determined Hiester was not disabled.

Hiester contends that the ALJ's conclusion that she was not disabled is

---

[16]  A vocational expert testified at the administrative hearing that Hiester performed light, unskilled work as a fast food worker, gas station attendant and cashier and light, semi-skilled work as a waitress.  (Id. at 55).  The vocational expert also testified that Hiester would be able to perform medium and light unskilled occupations with reasoning, math, and language skill levels of 2 or less and should be limited to self-paced, non-production work with only occasional interactions with co-workers, the public, and supervisors. (Id. at 59-62).

[17]  See n.8 supra (defining unskilled work).

flawed in several ways.  First, at step three, Hiester argues that the ALJ erred in finding that the severity level of her impairments did not meet the paragraph B criteria under the listings at 12.04 (affective disorders) or 12.06 (anxiety related disorders).  Second, Hiester  claims that the ALJ improperly assigned significant weight to both her Global Assessment of Functioning (hereinafter "GAF") scores and the opinion of the non-examining state agency psychologist.  Third, Hiester asserts that the ALJ failed in finding that she was able to perform medium, unskilled work.  Fourth, she avers that the objective medical evidence supports her alleged symptoms.  The court addresses these issues *in seriatim*.

### A.  Hiester's impairments did not meet the paragraph B criteria

The ALJ determined that Hiester's mental impairments did not meet the severity level requirements set forth in paragraph B of section 12.04 of the Listings of Impairments.  Hiester first argues that the ALJ improperly analyzed her impairments with regard to step three of the sequential evaluation and the "Listing of Impairments."  The Listing of Impairments describes impairments which render a claimant *per se* disabled without regard to his or her age, education, or past work experience.  Bowen v. Yuckert*, 482 U.S. 137, 153 (1987); Knepp v. Apfel*, 204 F.3d 78, 85 (3d Cir.  2000).  See also 20 C.F.R. §§ 404.1525(a), 416.925(a).  To qualify, a claimant must demonstrate that his

or her impairment (or combination of impairments) either "matches" a listing or is "equivalent" to a listing. <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530–531 (1990). An impairment "matches" a listing only if it satisfies *all* of the relevant medical criteria. <u>Id</u>. at 530. An impairment is "equivalent" to a listed impairment only if it is supported by medical findings equal in severity to *all* of the criteria applicable to the most similar listing. <u>Id</u>. at 531. The listing of impairments is a regulatory device used to streamline the decision-making process by identifying those claimants whose medical impairments are so severe that they would be disabled regardless of their vocational background. <u>Zebley</u>, 493 U.S. at 532 (citations omitted). Thus, the listings set forth medical criteria for the enumerated impairments at a higher level of severity than the statutory standard of disability. The listing was designed to operate as a presumption of disability that makes further inquiry unnecessary. <u>Id.</u> The Third Circuit Court of Appeals has determined that the claimant bears the burden of presenting evidence to support his or her allegation of *per se* disability. <u>Williams v. Sullivan</u>, 970 F.2d 1178, 1186 (3d Cir.1992).

In the instant case, the ALJ concluded that Hiester failed to meet her burden to "present medical findings equal in severity to all the criteria" of a listed impairment. <u>Zebley</u>, 493 U.S. at 531. Specifically, the ALJ stated that Hiester's impairments did not individually or in combination meet or medically

equal the paragraph B criteria of the listings for "Affective Disorder" under section 12.04 and for "Anxiety" under section 12.06.  (R. at 16-17); 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04(B) (hereinafter "section 12.04(B)").[18]

To satisfy the paragraph B criteria, Hiester must establish that her mental impairments result in at least two of the following: "(1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence or pace; or (4) repeated episodes of decompensation, each of extended duration."[19]  Section 12.04(B).  To find a marked impairment, the ALJ must examine the nature and overall degree of interference with function. 20 C.F.R. pt 404, subpt. P, app. 1, § 12.00(c).   In making the determination of whether Hiester's ailments amount to "marked" impairments, the ALJ examined the objective medical evidence in conjunction with Hiester's testimony.

The relevant objective medical evidence includes an evaluation performed on October 23, 2009, by Jonathan Rightmyer, Ph.D., a state

---

[18]  The paragraph B criteria for listings 12.04 and 12.06 are identical.

[19]  A "marked" limitation means more than moderate but less than extreme.  "Repeated episodes of decompensation, each of extended duration" means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.  (R. 16).

agency psychologist. (R. at 276). Dr. Rightmyer determined that Hiester had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. (Id.) Dr. Rightmyer concluded that Hiester was able to meet the basic mental demands of competitive work on a sustained basis despite her mental limitations. (Id. at 281).

Dr. Rightmyer's assessment was consistent with the September 30, 2009 report of Raymond S. Klein, Ed.D., a state agency psychologist who reviewed Hiester's medical records and performed a consultative psychological evaluation. (Id. at 261). Dr. Klein reported that Hiester was "slightly limited" with regard to her ability to understand, remember and carry out short, simple and detailed instructions and make judgments on simple work-related decisions. (Id. at 262, 264). Further, Dr. Klein stated that Hiester was "moderately" limited with regard to her ability to respond appropriately to supervision, co-workers and work pressures. (Id. at 264).

Regarding her functional limitations, Hiester testified that she does not have any difficulties with personal care activities and she is able to manage her household without assistance including preparing meals, cleaning the house, washing clothing and caring for four children. (Id. at 175-76).

Moreover, Hiester stated that she leaves her house on a daily basis, drives a car, and regularly goes shopping in public places, such as Wal-Mart, without assistance. (Id. at 178-79). Hiester further reported that she does not get along well with others and must always be "right." (Id. at 180). Additionally, Hiester alleged that her bipolar disorder makes it difficult for her to understand concepts, follow directions, or complete tasks. (Id. at 16, 180, 184).

Upon consideration of the above relevant evidence, the ALJ found that Hiester had only mild restriction in activities of daily living based on her testimony that she does not have any difficulties with personal and household care activities. (Id.) Hiester argues that the ability to do such activities cannot be equated to the ability to perform substantial gainful activity. Rather, she asserts, the focus should be on her inability to complete such tasks without extra supervision or assistance. The ALJ noted, however, that Hiester would not require special supervision in order to sustain a work routine and that she is able to perform repetitive work activities without constant supervision. (Id. at 19).

Additionally, the ALJ determined that Hiester has only moderate difficulties in social functioning. (Id. at 16). Hiester argues that she has demonstrated a "marked" impairment in social functioning based on her history of altercations and firings as well as her difficulty with interpersonal

relationships in the work place. The ALJ found, however, that her

impairments are not so severe that she limits social activities such as going

out in public on a daily basis without assistance and frequently taking

shopping trips to Wal-Mart. (Id. at 16, 180). With regard to concentration,

persistence or pace, the ALJ found that Hiester had moderate difficulties,

stating that her work record revealed that she had multiple employers for short

periods of time, which indicates her inability to adapt to some stressful

circumstances. (Id. at 16). Hiester asserts that she has demonstrated a

"marked" impairment in concentration, persistence, or pace based on the fact

that she is repeatedly sent home from work early for failing to perform her

duties adequately. The ALJ concluded, however, that she has the ability to

sustain attention and persist at simple tasks, basing his assessment in part on

the fact that at the time of the hearing she was working full-time at Dunkin

Donuts, during the store's busiest hours. (Id. at 19). Finally, the ALJ found no

evidence that Hiester has experienced any episodes of decompensation, each

of extended duration. (Id. at 16).

Based on the standards set forth in the listing of impairments and upon

review of the record as a whole, including the opinions of two psychologists

and Hiester's own testimony, we find that substantial evidence supports the

ALJ's determination that Hiester's mental impairments failed to satisfy the

paragraph B criteria of sections 12.04 and 12.06.

**B. Hiester's Global Assessment of Functioning Scores**

The ALJ placed weight on Hiester's Global Assessment of Functioning (hereinafter "GAF") scores in evaluating her allegations of disabling mental impairments. Hiester argues that the ALJ erred in placing weight on her GAF scores. A GAF score is a subjective scale that "assesses how well an individual can function according to psychological, social, and occupational parameters, with the lowest scores assigned to individuals who are unable [to] care for themselves." Pounds v. Astrue, 772 F. Supp. 2d 713, 716, n.2 (W.D. Pa. 2011); DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS (FOURTH). The law provides that "[a] GAF score does not have a direct correlation to the severity requirements of the Social Security mental disorder listings." Pounds v. Astrue, 772 F. Supp. 2d 713, 723 (W.D. Pa. 2011) (See also Gilroy v. Astrue, 351 F. App'x 714, 715 (3d Cir. 2009)). "Because the GAF scale does not directly correlate to the severity requirements in the mental disorders listings, a GAF score should be considered with all of the evidence but it is not dispositive." Davis v. Astrue, 830 F. Supp. 2d 31, 46 (W.D. Pa. 2011) (citing Galvin v. Commissioner of Social Sec., CA No. 08–1317, 2009 WL 2177216, at *1, n.5 (W.D. Pa. 2009)).

In the instant case, the ALJ properly considered Hiester's GAF scores in

conjunction with all of the medical evidence as well as Hiester's reported activities.  (Id. at 16-20).  On June 4, 2008, Dr. Henry Wehmen of the Stevens Mental Health Center diagnosed  Hiester's Bipolar I disorder in full remission and rated Hiester's GAF score at 70, indicating only mild to borderline transient psychological symptoms.  (Id. at 221-25).  On January 18, 2010, psychiatrist Pon Lion Tsou, M.D., of the Pennsylvania Counseling Services evaluated Hiester and rated her GAF score at 55, indicating moderate psychological symptoms.  (Id. at 323).  In six subsequent evaluations, Dr. Tsou rated Hiester's GAF score at 58, indicating moderate psychological symptoms.  (Id. at 316-21).

In finding that Hiester's impairments did not render her incapable of engaging in substantial gainful activity, the ALJ considered Hiester's GAF scores of  70 and 58,  indicating only moderate to mild/transient psychological symptoms.  (Id. at 18).  The ALJ, however, also considered Dr. Tsou's treatment notes, Dr. Klein's consultative examination findings, Dr. Rightmyer's opinion, and Hiester's reported daily activities.  (Id.  at 16-20).  These facts taken together provide substantial evidence for the ALJ's conclusion that although Hiester had some mental limitations, she was not completely disabled from performing full-time work.  Accordingly, Hiester's argument is without merit.

## C. The Opinion of the Non-examining State Agency Psychologist

In making his decision the ALJ relied in part on the opinion of Dr. Klein, the non-examining state agency psychologist, regarding Hiester's residual functional capacity.  (Id. at 261).   Hiester argues that the ALJ erred in giving great weight to Dr. Klein's opinion.  Specifically, Hiester argues that Dr. Klein failed to identify exactly how many hours a day Hiester was capable of working.

On September 30, 2009, Dr. Klein performed a consultative psychological evaluation on Hiester and found that her "conditions do not appear to be extremely severe."  (Id. at 262).  Dr. Klein determined that with psychological counseling and medication, Hiester should be able to function in a gainful situation for "more than half a day or half week."  (Id. at 263).  Hiester asserts that under Social Security Ruling 96-8p, an individual must be capable of sustaining work activity on a regular and continuing basis for eight hours a day, five days a week.  She claims that given the specific parameters set forth in Social Security Ruling 96-8p, Dr. Klein was required to set a fixed minimum number of hours at which Hiester would be capable of working.  We disagree. It is the sole responsible of the ALJ, and not the treating or non-treating physician, to determine a plaintiff's residual functional capacity.  See 20 C.F.R. §§ 404.1546(c), 416.946(c).  Dr. Klein was not required to provide a

specific figure regarding the minimum number of hours Hiester was capable of working because opinions, regardless of their source, on a determination of a plaintiff's residual functional capacity are not entitled to any particular weight or deference from an ALJ. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

The ALJ properly exercised his responsibility of determining Hiester's residual functional capacity by giving great weight to all of the objective medical evidence, including Dr. Klein's assessment, and reasonably found that Hiester was capable of performing a limited range of full-time work. (R. at 17). Thus, we find no merit to Hiester's claim.

### D. Hiester is Capable of Performing Medium, Unskilled Work

The ALJ found Hiester capable of performing medium, unskilled work activity as a kitchen helper, industrial cleaner or a laundry laborer. Hiester argues this decision is flawed because the Dictionary of Occupational Titles (hereinafter "DOT") specifies that persons working these jobs must have a reasoning level of "2," which she alleges is beyond her mental capacity.[20]

In determining whether a successful adjustment to other work can be made, the ALJ must consider the claimant's residual functional capacity, age,

---

[20] The Dictionary of Occupational Titles is published by the Department of Labor and is one of the sources the Board uses to determine whether unskilled, sedentary, light and medium jobs exist in the national economy. 20 C.F.R. § 220.131.

education and work experience in conjunction with the Medical-Vocational Guidelines.  <u>See</u> 20 CFR pt. 404, Subpt. P, app. 2.  The ALJ must determine whether the claimant can perform all or substantially all of the exertional demands at a given level of exertion.  <u>See</u> SSR 83-11,1983 WL 31252, at *2. If the claimant has solely nonexertional  limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for the ALJ's decision-making.[21]  SSR 85-15, 1985 WL 56857, at *3.

In the instant case, the ALJ considered Hiester's residual functional

_____

[21]  The term "Nonexertional limitations"  is defined in the regulations of the Social Security Administration, in pertinent part, as follows:

(c) Nonexertional limitations.

1. (1) When the limitations and restrictions imposed by the claimant's impairment(s) and related symptoms, such as pain, affect only the claimant's ability to meet the demands of jobs other than the strength demands, the Board considers that the claimant has only nonexertional limitations or restrictions. Some examples of nonexertional limitations or restrictions include the following:

\*          \*          \*

(ii) Difficulty maintaining attention or concentration;

(iii) Difficulty understanding or remembering detailed instructions . . .

20 C.F.R. § 220.135(c).

capacity, age, education and work experience together with all of the relevant objective medical evidence of her mental impairments and found that her ability to perform work at all exertional levels is compromised by her nonexertional limitations.  (Id. at 20).  These nonexertional limitations include her moderate difficulty in maintaining attention or concentration as well as in understanding or remembering detailed written instructions.  (Id. at 16).  To determine the extent to which these limitations erode the occupational base of unskilled work at all exertional levels, the ALJ  presented an impartial vocational expert with a hypothetical question and asked whether jobs exist in the national economy for a hypothetical individual of Hiester's age, education, work experience, and residual functional capacity.  (Id. at 21, 57-62).  The ALJ included in his hypothetical that such an individual be limited to unskilled occupations with a language level of  two or less that involve understanding, remembering and carrying out simple instructions, only occasional interactions with coworkers, the public, and supervisors, and that the work activity be limited to self paced non-production work.  (Id. at 57-58).  In response, the vocational expert testified that, given all of the hypothetical factors, the individual would be able to perform the requirements of the following unskilled occupations: (1) kitchen helper at the medium exertional level, an unskilled position with 160,000 jobs available nationally and 600 regionally; (2) an

industrial cleaner, at the medium exertional level, an unskilled position with 143,000 jobs nationally and 500 regionally; and (3) a retail marker at the light exertion level, an unskilled position with 40,000 jobs available nationally and 100 positions regionally.[22]  (Id. at 59-62).

Hiester alleges that the ALJ erred by failing to include in his question to the vocational expert that the hypothetical individual must have a General Educational Development  (GED) reasoning level of  "2" as defined in the DOT.[23]  Included in the DOT definition of a reasoning level "2" is the ability to carry out "detailed but uninvolved written or oral instructions."  Hiester argues that the ALJ was required to include in his hypothetical that the individual be able to carry out "detailed but uninvolved written or oral instructions."  She asserts that she is unable to meet the skill levels of the occupations identified by the ALJ and that the omission of the DOT reasoning level "2" requirements undermines the vocational expert's assessment.  To determine the level of skill required by a particular occupation, however, the ALJ is not required to

---

[22]  Hiester made no argument with regard to the identified job of retail marker, which has a reasoning level and an SVP of 2.

[23]  The GED reasoning level "2" is defined as the "ability to apply common sense and understanding, to carry out detailed but uninvolved written or oral instructions and deal with problems involving a few concrete variables in or from standardized situations."  Dictionary of Occupational Titles, App'x C(III) (Dep't of Labor, 4th ed. 1991).

make an assessment of the DOT reasoning levels. Rather, the ALJ is permitted to rely on the Commissioner's regulatory definition of unskilled work set forth in SSR-00-4p to determine the level of skill, judgment and specific vocational preparation (hereinafter "SVP") time required by the occupations identified by the vocational expert. 20 C.F.R. § 404.1568(a); SSR 00-4p, 2000 WL 1898704, at *3 (stating that the Commissioner's "regulatory definitions of skill levels are controlling.").

Here, the ALJ found that Hiester is capable of performing unskilled work with a SVP level of "2."[24] "[U]sing the skill level definitions in 20 C.F.R. 404.1568 and 416.968, unskilled work corresponds to an SVP level of 1-2." SSR 00-4p. The jobs identified by the vocational expert had SVP levels of 1or 2, which corresponds to the Commissioner's regulatory definition of unskilled work. Thus, it would be inconsistent with the Commissioner's regulatory scheme to rely upon the "reasoning levels" in the DOT as evidence that the mental demands of the jobs identified by the vocational expert exceed those

---

[24] Specific vocational preparation is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. Dictionary of Occupational Titles, App'x C(II) (Dep't of Labor, 4th ed. 1991). An SVP level 2 indicates that "[a]nything beyond short demonstration up to and including 1 month" is needed to learn the job. Id.

for unskilled work.  20 C.F.R. §§ 404.1568(a), 416.968(a).

As such, the ALJ properly determined that Hiester has the ability to perform work activities at the medium unskilled levels with appropriate limitations, including each of the occupations identified by the vocational expert.  The ALJ did not err in making his determination and his conclusions are supported by substantial evidence in the record.

### E.  ALJ's Finding that Hiester was Not Fully Credible

As noted above, the ALJ found Hiester's testimony regarding her mental impairments to be not credible.  Hiester argues that the ALJ improperly discounted her credibility.  After a careful review, we find that the ALJ properly considered Hiester's credibility.

The Social Security Regulations provide a framework under which a claimant's subjective complaints are to be considered when the disability determination turns on an assessment of the level of a claimant's pain.  20 C.F.R. § 404.1529.  Such cases require the ALJ to "evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work."  Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999).  Cases involving an assessment of subjective reports of pain "obviously require the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is

disabled by it." Id.

The social security statute and regulations guide the ALJ's assessment of subjective reports of pain. This guidance eschews wholly subjective assessments of a claimant's pain. Instead, at the outset, the ALJ is admonished that:

> [a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all the evidence . . . , would lead to a conclusion that the individual is under a disability.

42 U.S.C. § 423(d)(5) (A). Applying this statutory guidance, the Social Security Regulations provide a framework under which a claimant's subjective complaints are to be considered. See 20 C.F.R. § 404.1529. Under these regulations, symptoms, such as pain, shortness of breath, and fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. § 404.1529(b). Once a medically determinable impairment which results in such symptoms is found to exist, the Commissioner must evaluate

the intensity and persistence of such symptoms to determine their impact on the claimant's ability to work.  Id.  In so doing, the medical evidence of record is considered along with the claimant's statements.  Id.         In the instant case, Hiester reported severe pain and symptoms caused by her mental impairments.  Specifically, on her initial application Hiester alleged that (1) she suffers from severe inattention; (2) she has visual hallucinations; (3) she "hears voices"; (4) she has an inability to focus; and (5) she compulsively picks her face.  (R. at 19-20).  The ALJ, however, found that Hiester's allegations of severe inattention and inability to focus were contradicted by the fact that, at the time of the hearing, she was consistently working the busiest shift at Dunkin Donuts.  (Id. at 19).  Further, in his finding that Hiester's subjective reports of  "audio or visual hallucinations" were not credible, the ALJ gave great weight to the fact that Hiester never reported any such hallucinations to her treating physicians.  (Id.)

   After careful review of the record as a whole, the ALJ found that Hiester had medically determinable impairments that could reasonably be expected to cause the symptoms alleged but that the record did not support Hiester's statements concerning the intensity, persistence, or limiting effects of her impairments.  (Id. at 18).  The ALJ noted that Hiester's allegations of disabling symptoms were inconsistent with the reports of her treating physicians, who

found only "moderate to mild/borderline transient" psychological symptoms which were stable with Hiester's medications. (Id. at 18, 221, 316-321). Moreover, the ALJ found Hiester's statements were inconsistent with the non-examining state agency psychologist's consultative examination findings of only "slight to moderate" psychological symptoms. (Id. at 19). The ALJ additionally afforded great weight to the fact that Hiester's complaints were inconsistent with her own routine activities which included caring for four children, driving a car, and managing her household and finances, all without assistance. (Id. at 30,176-78, 319).

Hiester argues that the ALJ failed to conduct the proper analysis regarding the intensity, persistence, or limiting effects of her impairments. Specifically, Hiester asserts that the ALJ failed to discuss what weight he put on Hiester's testimony that (1) she tried to run her child's father over with her car; (2) she has been arrested on a charge of criminal harassment resulting from a violent altercation with another woman; and (3) she frequently has violent physical fights with her present boyfriend. Hiester avers that, taken together, these prior incidents reflect that she suffers from severe symptoms caused by her mental impairments. The ALJ was not required, however, to give a written evaluation of each piece of evidence or testimony. Rather, an ALJ must provide a clear and satisfactory explication of the basis on which his

determination rests. <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981). The ALJ's determination regarding Hiester's credibility should be afforded great deference. <u>See Reefer v. Barnhart</u>, 326 F.3d 376, 380 (3d Cir. 2003) (citing <u>Atl. Limousine, Inc. v. N.L.R.B.</u>, 243 F.3d 711, 718 (3d Cir. 2001).

Accordingly, because the ALJ explained his analysis of the evidence and the reasons why he found Hiester's subjective complaints to be not fully credible, he fulfilled his obligations under the regulations and was not required to specifically discuss each of Hiester's many subjective allegations. The ALJ properly determined that the evidence as a whole contradicted Hiester's subjective claims of disabling mental limitations and his finding that she was not fully credible was reasonable.

**Conclusion**

Based on our review of the administrative record and the reasons stated above, we find that the decision of the Commissioner that Hiester could engage in a range of full-time unskilled work at light to medium exertion levels is supported by substantial evidence. We will, therefore, affirm the decision of the Commissioner pursuant to 42 U.S.C. 405(g). An appropriate order will be entered.                                      **BY THE COURT:**

**Date: <u>January 8, 2014</u>**                    **s/ James M. Munley**
                                    **JUDGE JAMES M. MUNLEY**
                                    **United States District Court**